STATE of Missouri, Plaintiff–Respondent,

v.

Gary L. BISHOP, Defendant–Appellant.

No. 21088.

Missouri Court of Appeals, Southern District, Division Two.

April 21, 1997.

---

Robert G. Duncan, Kansas City, for defendant-appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Sara L. Trower, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

SHRUM, Judge.

Following a jury trial, Gary L. Bishop (Defendant) was convicted of possession of more than five grams of marijuana with intent to deliver, § 195.211 [1], and sentenced as a prior drug offender to twenty-two years imprisonment. Defendant appeals the judgment of conviction.

In Point I, Defendant charges that the trial court erred by refusing to sustain certain of Defendant's requests to strike venirepersons for cause. In Point II, Defendant challenges the sufficiency of the evidence to support his conviction.

We find that the evidence was sufficient to support Defendant's conviction. However, the trial court erred when it rejected Defen-

dant's challenge for cause to venireperson Emma Gilmer who later served as a juror. We reverse and remand.

On July 20, 1995, while patrolling on I–55, Jeff Heath (Heath) of the Missouri Highway Patrol stopped a north-bound automobile because the driver was speeding. The stop occurred in Pemiscot County. The operator of the automobile, Nabil Abu Amsha (Abu Amsha), was alone. When Heath inquired about ownership of the automobile, Abu Amsha produced a rental agreement that listed Defendant as the renter of the vehicle. During this traffic stop, Heath asked if he could search the vehicle. The driver consented. During the ensuing search, Heath found ten bundles of marijuana in a box located in the trunk of the car. When asked about the marijuana, Abu Amsha told Heath that he knew it was there but did not know how much. Abu Amsha's explanation was that the marijuana belonged to Defendant, that Defendant was following in another rental car which was a white Pontiac with Michigan plates, and that he (Abu Amsha) was actually transporting the marijuana for Defendant. Heath then "contacted the local policemen" and requested that they stop and arrest Defendant.

While waiting for Defendant's apprehension, Heath had the rental car towed from the highway by a local towing service. Meanwhile, Defendant was stopped and arrested in New Madrid County. After his arrest, Defendant was brought to the towing company.

Trooper Graves (Graves), who transported Defendant from the arrest site to Pemiscot County, testified that he advised Defendant of his rights per the *Miranda* warning. Continuing, Graves testified that about ten minutes after the *Miranda* warning was given, Defendant "demanded to know why he was being arrested." Graves responded that it was related to marijuana, whereon "[Defendant] admitted his involvement with the transportation of marijuana." When asked specifically what Defendant had said, Graves

---

**1.** All statutory references are to RMo 1994 unless    otherwise indicated.

answered: "That he [Defendant] had rented another vehicle, that another driver was actually driving to Michigan for him, but that he [Defendant] was not in possession of any [marijuana]." Graves testified that he asked Defendant if he would cooperate in delivering the marijuana to its intended destination, but Defendant declined, saying: "[H]e could not, that the marijuana was going to his son, and that when he saw someone was behind him, that he had telephoned his son and told him that there was something up."

After Graves brought Defendant to the towing company site, he was questioned further. Heath testified that in response to his questions, Defendant told him that he and Abu Amsha had gone to Houston, Texas, where he [Defendant] bought 56 pounds of marijuana for $27,000. Defendant also told Heath that he was paying Abu Amsha $100 per day "to help him [Defendant] transport the marijuana to Michigan to his son."

Defendant told essentially the same story to another highway patrol employee, Mark McClendon (McClendon), i.e., that the marijuana belonged to Defendant and his son, that he [Defendant] had bought the marijuana in Houston two days earlier for $27,000, and that Defendant had rented the car in which the marijuana was found. Additionally, Defendant told McClendon that he had bought a container for the marijuana, that "he and another male had placed the marijuana in the storage container and that he (Defendant) had placed the container inside the [rental car]."

Defendant offered no evidence. Throughout the trial, Defendant took the position that there was no evidence connecting him with the marijuana and that he was not in possession of it.

At trial, seven jury panel members answered in one fashion or another when, during voir dire, defense counsel asked their views about an accused who does not testify

during trial. The trial court denied defense counsel's request that these seven venirepersons be stricken for cause. Ultimately, one of the seven served on the jury.

Defendant was convicted of possession of more than five grams of marijuana with intent to deliver. This appeal followed.

## JURY SELECTION

Defendant states in his first point that the trial court erred in overruling his challenge for cause to seven venirepersons. Six of the seven challenged venirepersons did not serve on the jury, however, because they were removed by Defendant's peremptory strikes or were dismissed because a full panel existed without them.

■ The State argues that because of § 494.480.4, we need only review Defendant's challenges of the one venireperson who actually served on the jury.[2] We agree.

Under the present version of § 494.480.4, failure to strike an unqualified juror is not reversible error of law unless the unqualified juror actually served on the final jury. *State v. Wise*, 879 S.W.2d 494, 512, n. 9 (Mo.banc 1994); *State v. McElroy*, 894 S.W.2d 180, 184[2] (Mo.App.1995). Defendant is not entitled to appellate relief as to the six venirepersons who did not serve.

■ Emma Gilmer was the venireperson who served after Defendant's challenge for cause as to her was overruled. On appeal, Defendant contends that his challenge to Gilmer should have been sustained because of Gilmer's voir dire answer that she would have a problem with drawing no inference of guilt if Defendant did not testify.

In reviewing Defendant's claim, we are mindful that a trial court has broad discretion in ruling on challenges for cause. *State v. Harris*, 870 S.W.2d 798, 805 (Mo.banc 1994). Appellate courts will not disturb a

---

**2.** § 494.480.4 reads: "4. The qualifications of a juror on the panel from which peremptory challenges by the defense are made shall not constitute a ground for the granting of a motion for

new trial or the reversal of a conviction or sentence unless such juror served upon the jury at the defendant's trial and participated in the verdict rendered against the defendant."

trial court's ruling on a challenge for cause unless it constitutes a clear abuse of discretion and results in a real probability of injury to the complaining party. *Id.* at 805–806[4]. The qualifications of a venireperson are not determined conclusively by a single response but are made on the basis of the entire examination. *State v. Brown,* 902 S.W.2d 278, 285[3] (Mo.banc 1995).

Here, the following occurred during defense counsel's questioning of prospective jurors:

"Q. [by defense counsel] [A]nother cornerstone of our system of justice is that a person who's accused of a crime does not have to testify. And there can be no inference of guilt drawn from ... their not testifying, and no inference at all, your can't, if somebody does not testify, you can't even infer at all and draw any inference at all that they were guilty. And, in this case, [Defendant] may not testify. And is there anyone here who believes that just because a person does not testify, that you would be more likely to vote guilty? ... [i]s there anyone here who thinks that if a person does not testify, that they're hiding something? I take it from your silence that everybody agrees that if a person does not, and if [Defendant] does not testify here today? Yes, sir?

"A. EUGENE KELLEMS [venireperson] I have a problem with that.

"Q. ... Is there anyone else who has a problem with drawing no inference at all from a person not testifying?

"A. JUANITA LACY [venireperson] I think I do too, yeah.

. . . .

"Q. Is there anyone else?

"A. EMMA GILMER: Emma Gilmer."

Thereon, defense counsel moved to other inquiries and Gilmer was never again questioned about her concerns about an accused who does not testify.

Later, during the conference to consider challenges for cause, counsel specifically challenged Gilmer for cause. He reminded the judge that Gilmer was among those who answered affirmatively that "they had a problem with a defendant who did not testify ... that there would be an inference of guilt, or think would have a problem having no inference of guilt...." After hearing defense counsel's motion and his reasons for striking venireperson Gilmer, the court heard argument from the prosecutor in which he mistakenly stated: "I think they [the seven challenged prospective jurors] also said they would follow the Court's instructions...."

The court rejected Defendant's challenge for cause, saying:

"THE COURT: Just the one general question that [defense counsel] asked ..., without anything further, they've all sworn to follow the law and all been advised of the defendant's right to remain silent. I think the question was posed in such a way, if the defendant doesn't take the stand, you think he's hiding something, and something along those lines, and would you have a problem with that and all of them said, yeah, I might have a problem with that. I don't think that's sufficient to say that they could not follow the instructions of the Court and the law as to each of those."

To qualify to serve as a juror, a person must be able to answer the questions presented with an open mind free from bias and prejudice. *State v. Ervin,* 835 S.W.2d 905, 915[6] (Mo.banc 1992). A trial court commits reversible error if it denies a legitimate request by an accused to excuse for cause a partial or prejudiced venireperson and such unqualified juror actually serves on the final jury. *Wise,* 879 S.W.2d at 512 n. 9; *McElroy,* 894 S.W.2d at 184[2]. "The critical question in a bias challenge is whether the venireperson unequivocally indicated an ability to evaluate the evidence fairly and impartially." *State v. Storey,* 901 S.W.2d 886, 894 (Mo.banc 1995). A trial court has a duty to make an independent inquiry when a prospective juror equivocates about his or her ability to be fair and impartial. *State v.*

*Walton,* 796 S.W.2d 374, 377[5] (Mo.banc 1990). Where a venireperson's answer suggests a possibility of bias, but upon further questioning that person gives unequivocal assurances of impartiality, the bare possibility of prejudice will not disqualify such rehabilitated juror nor deprive the trial court of discretion to seat such venireperson. *Id.* at 377[6].

Defendant argues that Gilmer's answer revealed an attitude about a non-testifying accused that disqualified her as a juror and that the record fails to show that she was rehabilitated. He insists that Gilmer never unequivocally stated that she would not draw an unfavorable inference of guilt from Defendant's failure to testify or that she could follow the law and instructions of the court, if given, as to such matters. With that as his premise, Defendant insists the trial court erred when it failed to sustain his challenge to Gilmer.

To support his argument, Defendant cites *State v. Holland,* 719 S.W.2d 453 (Mo.banc 1986), where our supreme court reversed and remanded a conviction because the trial court overruled the accused's challenge for cause to venireperson Stein. During voir dire, Stein stated that he would like to hear the Defendant's side of the story. After defense counsel explained that Holland did not have to take the stand, she asked Stein: "Even if the judge instructed you not to think that way, would you still have a hard time with it?" Stein answered: "Because I wouldn't really know about the facts if he didn't get up there and tell about it." *Id.* at 454. In reversing Holland's conviction, the supreme court stated:

"Scattered through the transcript are several instances of inquiry made to venireman Stein on other subjects and on at least two occasions these inquiries came from the prosecutor. However the questions asked on those occasions did not touch on Stein's beliefs or attitudes con-

cerning the presumption of innocence if defendant failed to testify or whether he could follow the law and instructions from the bench on such matters.

"During the conference to consider challenges for cause, counsel presented their objections to several prospective jurors and the court sustained motions to strike as to three veniremen, but after hearing defense counsel's motion and her reasons for striking venireman Stein, the court heard argument from the prosecutor in which he mistakenly stated he had confronted Stein with the fact that 'you will be given instructions you cannot infer guilt from the failure to testify and when I put it in those terms, [Stein] said: Yes, he could follow that instruction.' The prosecutor continued and again mistakenly stated that when Stein was 'confronted with the very question: "Can you follow that instruction that it cannot be inferred from the fact the defendant did not testify that he is guilty," he indicated: "Yes."' *Had such question been presented to Mr. Stein and had he given such an answer we would have quite a different case,* but the trial court, apparently relying on the prosecutor's mistaken recollection of the record stated: 'I am going to overrule the objection. I think there was sufficient basis to indicate [Stein] could follow the instructions.'" (emphasis added).

719 S.W.2d at 454–455.

The facts of this case are akin to those in *Holland.* During this voir dire, several inquiries were made of Gilmer on other subjects and on at least one occasion such inquiry came from the prosecutor.[3] However, Defendant is correct when he says that the other questions posed to Gilmer did not touch on her beliefs or attitudes or the inferences she might draw from Defendant's failure to testify. After Gilmer disclosed that she might infer guilt if Defendant did not testify, had she thereafter been asked if she would follow the court's instructions de-

---

3. The prosecutor asked the panel if any were acquainted with defense counsel. Gilmer stated that defense counsel's firm had once sued her for

a medical bill. When asked if, despite that fact, she could give both sides a fair trial, Gilmer answered affirmatively.

spite her concerns about his not testifying, we would have quite a different case. *See Holland,* 719 S.W.2d at 454. However, the trial judge either relied on the prosecutor's recollections as a basis for overruling Defendant's challenge for cause as to Gilmer, or mistakenly believed that other responses by Gilmer rehabilitated her even though the other inquiries did not touch on her beliefs or attitudes concerning the presumption of innocence. As happened with the juror in *Holland,* in this case no one made any attempt to rehabilitate venireperson Gilmer or seek further information to clarify or explain her answers; consequently, reversible error was committed by allowing Gilmer to serve on the jury. *See Holland,* 719 S.W.2d at 455. *See also State v. Stewart,* 692 S.W.2d 295 (Mo.banc 1985).

In reaching our conclusion we do not ignore the State's claim that Gilmer never equivocated concerning her ability to be fair and impartial and to follow the court's instructions. To develop this argument, the State first points out that additional questioning of Gilmer never occurred and she never elaborated on why she stated her name in response to defense counsel's question. We note, however, that Gilmer's answer merely complied with earlier instructions given the panel, i.e., "when you respond to a question ... begin by saying [your] name...." Considering the form of the question, i.e., "[i]s there anyone else who has a problem with drawing no inference at all from a person not testifying" and prior affirmative answers by other venirepersons, Gilmer's response clearly indicated her possible bias against an accused who did not testify. Failure to elicit from her the cause for such bias is irrelevant.

Secondly, the State points to MAI–CR 3rd 300.02, a pattern instruction read to the jury before and during the voir dire. This instruction told prospective jurors that they had the duty to follow the law as given them in instructions even if they disagreed with it. Moreover, the instruction directed panel members to raise their hands if any of them were unwilling, for any reason, to follow the

court's instruction. No one responded to that directive. The State also relies on the prosecutor's voir dire efforts where he first told the panel that they had to decide the case based on the evidence from the stand and the court's instructions, and then asked: "And knowing that, does anybody feel they could not be a fair juror to both sides in this case?" Again, no panel member responded. Finally, the State cites the fact that jury members were silent when defense counsel asked if they disagreed with the principle that the State had the burden of proof and that an accused is presumed innocent. The State then argues: "By their silence, every venire person indicated their acceptance of these principles and their ability to follow the court's instruction on these issues."

The timing of these inquiries is fatal to the State's argument. The silence of the panel members indicating their ability to follow the law as provided them by the court came before the panel was told they could not draw any inferences from the accused's failure to testify. The specific inquiries made of the panel members about their attitudes, i.e., concerning the presumption of innocence and the State having the burden of proof, did not include an explanation that a juror could not draw an inference of guilt because an accused failed to testify. It was only after defense counsel's later explanation of that principle that Gilmer indicated that she had a problem with not drawing an inference of guilt from failure to testify. Contrary to the State's position, we view Gilmer's response as a clear indication of bias; yet, neither the prosecutor nor the trial judge tried to question Gilmer further on this subject and thereby attempted to procure unequivocal assurances of her impartiality if Defendant did not testify. Without such assurance, Gilmer was disqualified and the trial court erred in rejecting Defendant's for cause challenge of Gilmer. *See Holland,* 719 S.W.2d at 454; *Stewart,* 692 S.W.2d 295.

Finally, we note that when *Holland* was decided, MAI–CR 2d 1.02 was the pattern instruction read to prospective jurors before and during voir dire. MAI–CR 2d 1.02 con-

tained this generic inquiry of prospective jurors: "Do you know of any reasons why you would be unable to follow the other instructions of the court?" The presumed lack of venireperson response to that inquiry in *Holland* did not relieve the prosecutor or trial court of their duty to attempt to rehabilitate venireman Stein. 719 S.W.2d at 455. Similarly, the lack of response by Gilmer to the inquiries of MAI–CR 3d 300.02 did not rehabilitate her where she later expressed doubt about a fundamental principle of law. The conviction must be reversed and remanded for a new trial.

## SUFFICIENCY OF EVIDENCE

■ We address Point II because if the evidence is insufficient to support his conviction for the reasons Defendant claims, then the case should be reversed without remand. This follows from our view that the State's evidence will be the same upon retrial; hence, we determine whether he is entitled to acquittal based on his Point II claims.

In this point, Defendant argues that the evidence presented at trial did not prove beyond a reasonable doubt that he had constructive or actual possession of marijuana in Missouri since there was no evidence that he had access or control over the marijuana in the vehicle driven by Abu Amsha. We disagree, and find that the evidence at trial demonstrated that Defendant had constructive possession of marijuana in the State of Missouri.

■ An appellate court reviewing a defendant's challenge to the sufficiency of evidence accepts as true all evidence favorable to the state, including all favorable inferences drawn from the evidence, and disregards all evidence and inferences to the contrary. *State v. Grim*, 854 S.W.2d 403, 405 (Mo.banc 1993); *State v. Garrison*, 896 S.W.2d 689, 690[1] (Mo.App.1995). " 'Appellate courts, reviewing the evidence for sufficiency, do not weigh the evidence, but rather determine whether there was sufficient evidence from which a reasonable person could conclude that defendant is guilty as charged.' " *State*

*v. Keller*, 870 S.W.2d 255, 259[6] (Mo.App. 1994) (quoting *State v. Cortez–Figueroa*, 855 S.W.2d 431, 440 (Mo.App.1993)).

In order to sustain a conviction for possession of a controlled substance, the state must prove (1) conscious and intentional possession of the substance, either actual or constructive, and (2) an awareness of the presence and the nature of the substance. *State v. Purlee*, 839 S.W.2d 584, 587[3] (Mo.banc 1992). Defendant does not challenge the State's evidence as to his awareness of the presence and nature of the marijuana. Rather, Defendant contends that the State did not prove he had either actual or constructive possession of the marijuana in the car driven by Abu Amsha.

"Possessing a controlled substance" is defined as follows:

"A person, with the knowledge of the presence and illegal nature of a substance, has actual or constructive possession of the substance. A person has actual possession if he has the substance on his person or within easy reach and convenient control. *A person who, although not in actual possession, has the power and the intention at a given time to exercise dominion or control over the substance either directly or through another person or persons is in constructive possession....*"

§ 195.010(33) (emphasis added). The record clearly demonstrates that Defendant was not in actual possession of the marijuana found in the rental car driven by Abu Amsha. Thus, the question becomes whether Defendant had constructive possession of the marijuana.

Missouri courts have found that a defendant exercising dominion and control over an object through another person is in constructive possession of that object. *State v. Hughes*, 702 S.W.2d 864, 867[4] (Mo.App. 1985); *State v. Dampier*, 862 S.W.2d 366, 370 (Mo.App.1993).

In *Hughes*, the defendant was charged with possession of an untagged deer which was found in the back of a pickup truck belonging to his friend. The defendant was

not in the truck when the conservation agent found the deer. The appellate court reasoned:

"Pursuant to Hughes's request, the deer was placed in Perdue's truck—the vehicle in which Hughes was also traveling. Perdue took no action inimical to Hughes's interest in the deer, but rather, in retrieving the deer for Hughes, he acted to preserve Hughes's interest. There is no claim that Hughes had renounced his interest in the deer and all of the evidence was consistent with the view that Hughes continued to exercise control over the deer through Perdue."

*Id.* at 867.

In *Dampier,* the defendant was convicted of possession of marijuana that another person took from a refrigerator in the apartment in which defendant and his niece lived. *Dampier* argued he did not have possession of the marijuana when it was delivered. In determining that *Dampier* had constructive possession, this court relied upon the above-cited reasoning of *Hughes.* Specifically, we found that *Dampier* demonstrated his control over the marijuana when he told the individual who had actual possession of the controlled substance that she could have it. *Id.* at 371. We also noted that the defendant admitted he had picked up the marijuana in Nebraska. *Id.*

Here, Defendant's admissions to highway patrol personnel are evidence that Defendant, although not in actual possession of the marijuana, had the power and intent throughout this trip to exercise dominion or control over this marijuana through another person; hence, he was in constructive possession thereof. *See* § 195.010(33). Defendant acquired a vehicle, in his name, to transport the marijuana. He hired an individual specifically to transport the marijuana for him. He bought a container in which to store the marijuana. Defendant and another person put the marijuana in the container and Defendant personally loaded the marijuana into the rental car. Later, when Abu Amsha was arrested, he told Heath that Defendant was

travelling behind him. This fact was confirmed when Defendant was seen travelling north on I–55 in New Madrid County and was then arrested. Defendant's intent to control Abu Amsha and the marijuana was reasonably inferable from the evidence that he had telephoned his son to report that someone was behind him and "that there was something up." Such evidence indicates that Defendant intended to keep his son apprised of the progress of their enterprise. Although Defendant kept some distance between his vehicle and the one driven by Abu Amsha, the evidence cited is consistent with the view that Defendant continued to exercise control over the marijuana through Abu Amsha as Abu Amsha crossed Pemiscot County. *See Hughes,* 702 S.W.2d at 867. Certainly, Abu Amsha took no action inimical to Defendant's interest in the drugs, but rather, acted to preserve Defendant's interest therein until Heath found the marijuana and seized it. *Id.* The facts cited provide sufficient evidence that Defendant exercised control of the marijuana through another person and thus was in constructive possession. *See* § 195.010(33).

Defendant cites *Purlee* for the proposition that, "[P]roof of constructive possession requires, at a minimum, evidence that defendant had access to and control over the premises where the substance was found." 839 S.W.2d at 588[5]. From that basis, Defendant argues that the State did not prove that he had access to the rental car in Missouri and, therefore he could not have had constructive possession of the marijuana. However *Purlee* and related cases that use such language can be distinguished from this case.

In *Purlee,* the defendant was charged with possession of marijuana in a van in which he and another person were travelling. The defendant claimed he did not know that his travelling companion was transporting marijuana in duffle bags in the back of the van, nor did he have access to the bags. Thus, the defendant challenged both the sufficiency of evidence pointing to his intentional possession and his awareness of the presence and

the nature of the controlled substance. *Id.* at 587. Putting the language cited by Defendant in context, the court states:

> "The two prongs of this test [intentional possession and awareness of presence and nature] are not entirely independent. Absent proof of actual possession, constructive possession may be shown when other facts buttress an inference of defendant's knowledge of the presence of the controlled substance. Thus, proof of constructive possession requires, at a minimum, evidence that defendant had access to and control over the premises where the substance was found. Defendant's exclusive control of the premises is enough to raise an inference of possession and control of the substance. Joint control of the premises, however, requires some further evidence or admission connecting the accused with the illegal drugs."

*Id.* at 588[4–7] (citations omitted).

In this case, Defendant does not challenge the State's evidence that he was aware of the controlled substance in the car he rented. Moreover, he does not challenge on appeal the testimony of highway patrol personnel regarding Defendant's admissions that he bought the marijuana, rented the car, placed the marijuana in the car and hired Abu Amsha to drive the car carrying the marijuana. Defendant does not challenge on appeal the rental agreement showing that he rented the car Abu Amsha was driving. Therefore, we decide the limited question of whether Defendant had constructive possession of the marijuana through his control of another person. *See* § 195.010(33). We find that he did. Defendant's second point is denied.

We reverse and remand.

CROW, P.J., and MONTGOMERY, C.J., concur.