**STATE of Missouri, Plaintiff–Respondent,**

v.

**James L. CLARK, Defendant–Appellant.**

**No. 23994.**

Missouri Court of Appeals,
Southern District,
Division One.

Aug. 29, 2001.

Motion for Rehearing and Transfer Denied Sept. 18, 2001.

Application for Transfer Denied Oct. 23, 2001.

Emmett D. Queener, Asst. Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Adriane D. Crouse, Asst. Atty. Gen., Jefferson City, for Respondent.

SHRUM, Presiding Judge.

Following a jury trial, James L. Clark ("Defendant") was convicted of assault of a law enforcement officer in the second degree, § 565.082.1(3)[1], and sentenced to ten years' imprisonment. Defendant appeals the judgment of conviction and sentence.

In Point I, Defendant charges the trial court erred when it refused to suppress a blood kit and a blood-alcohol test result and then allowed both into evidence over his objection. In Point II, Defendant charges the trial court erred by refusing to sustain Defendant's request to strike a venireperson for cause. This court finds no trial court error as charged. The judgment is affirmed.

On November 11, 1999, at around 10:00 p.m., officers Collard, Harmon, and Klink ("Victim") of the Joplin city police department were working a traffic accident at an intersection in Joplin, Missouri. Victim was directing traffic away from the accident scene when a driver pulled up next to Victim and pointed out a pickup truck that the driver had seen wandering all over the road. Thereon, Victim waved the pickup truck driver over to the side of the street. Victim asked the pickup truck driver, later identified as Defendant, to roll down his window, and Defendant responded by rolling down the window three-fourths of the way. When Victim asked Defendant what he was doing, Defendant replied that he was checking things out. As they talked, Victim noted the odor of intoxicants coming from inside the truck, saw that Defendant's eyes were bloodshot and watery, and that Defendant had an open beer bottle between his legs.

Based upon these observations, Victim wanted Defendant to perform some field sobriety tests. When Victim told Defendant to shut off his vehicle, Defendant just looked straight ahead and said, "uh-huh." As Defendant continued to look forward, Victim heard the "RPMs of the motor start to rise[.]" Victim then reached into the truck to shut off the motor because he believed Defendant was planning to drive away and had concern about the safety of two women standing in the road in front of Defendant's truck. As Victim reached into the truck, Defendant drove off with Victim's arm caught between the dashboard and steering wheel. Victim sustained some injuries during this incident.

Officer Collard, seeing Defendant drive off, pursued him in his patrol car. Defendant then wrecked his truck and fled on foot. Ultimately, another officer found Defendant and returned him to the accident scene. Thereon, Victim identified Defendant as the driver of the truck that he had earlier stopped.

Defendant was taken from the accident scene to a hospital. Collard testified that at the hospital, he noticed the odor of alcohol about the person of Defendant. Collard asked Defendant questions and talked loudly to him, but Defendant would not answer. At the suppression hearing, Collard testified Defendant was unconscious. At trial, Collard characterized Defendant as "very incoherent and/or unconscious. I couldn't tell either way. His eyes were closed, and I was getting no reaction from him." Based on his observations of Defendant, Collard asked Cynthia Aden ("Aden"), an emergency room nurse, to take a blood sample from Defendant using the police department's blood test kit. Aden took the blood sample from Defendant and gave it to Collard. A test

---

**1.** All statutory references are to RMo 2000    unless otherwise indicated.

of Defendant's blood showed his blood alcohol content was 0.21 percent.

Based on the above events, Defendant was charged with second-degree assault of a law enforcement officer in violation of § 565.082.1(3).[2] Through pre-trial motions, Defendant asked the court to exclude his blood and the blood-alcohol test results from his trial "because Defendant's blood was drawn without his consent, and without giving him an opportunity to refuse, in violation of the laws of the State of Missouri regarding implied consent."[3] After an evidentiary hearing, the court overruled Defendant's requests for exclusion and suppression of such evidence. At trial, Defendant's timely objections to the evidence were also overruled.

These rulings are the subject of Defendant's first point relied on. Specifically, Defendant argues that the trial court, by allowing the State to admit the blood-alcohol evidence, violated rights guaranteed him by "the Missouri Implied Consent Law, in that Officer Collard did not advise [Defendant] of his rights under the statute nor give him the opportunity to refuse to consent to having his blood drawn for the purpose of determining blood alcohol content, and the evidence was insufficient to establish that [Defendant] was unconscious and unable to withdraw the consent implied by the statute."

Several statutory provisions are pertinent in analyzing Defendant's argument. Under 577.020.1, any person driving on Missouri's highway's is "deemed to have given consent to ... a chemical test ... of the person's blood" under circumstances described in 577.020.1(1–4). However, drivers capable of making a decision may revoke this "implied consent" to testing. Thus, § 577.041.1 provides that "[i]f a person under arrest ... refuses upon the request of the officer to submit to any test allowed pursuant to section 577.020, then none shall be given...." On the other hand, § 577.033 provides that "[a]ny person who is dead, unconscious or who is otherwise in a condition rendering him incapable of refusing to take a test as provided in sections 577.020 to 577.041 shall be deemed not to have withdrawn the consent ... and the test ... may be administered."

■ Here, the question presented under Point I revolves around § 577.033, i.e., was there sufficient evidence to support the trial court's implicit finding that Defendant was "unconscious, or ... otherwise in a condition rendering him incapable of refusing to take a test" to determine his blood-alcohol content? Defendant insists this court should answer this question in the negative and find there was not sufficient evidence to support such a finding. Specifically, Defendant asserts the trial court abused its discretion by accepting "Officer Collard's claims that [Defendant] was unconscious, when those claims fly in the face of the contrary evidence offered by [Aden] ... who drew blood at ... Collard's request." From his argument, we discern that Defendant would have this court ignore the well-established principle that the trial court is the sole judge of witness credibility, and this determination will not be upset by an appellate court. *See State*

---

**2.** In pertinent part, § 565.082.1(3) provides:
"1. A person commits the crime of assault of a law enforcement officer in the second degree if he:
....
"(3) While in an intoxicated condition ..., operates a motor vehicle in this state and when so operating, acts with criminal negli-

gence to cause physical injury to a law enforcement officer."

**3.** Excluding this evidence from the case was critical to Defendant because driving while intoxicated is an element of the offense for which Defendant was charged. See n. 2.

*v. Immekus,* 28 S.W.3d 421, 429 (Mo.App. 2000). Any request by Defendant urging this court to weigh the testimony of one witness above that of another is misguided.

■ On a motion to suppress evidence, the prosecution bears the burden of showing by a preponderance of the evidence that the motion should be denied. *State v. Davis,* 980 S.W.2d 92, 94[2] (Mo. App.1998). Upon review of the denial of a motion to suppress and the subsequent admission of the evidence at trial, an appellate court is limited to determining whether sufficient evidence exists to sustain the trial court's rulings. *State v. Woolfolk,* 3 S.W.3d 823, 828[1] (Mo.App. 1999); *State v. Kelley,* 953 S.W.2d 73, 87[31] (Mo.App.1997). We view the facts in the light most favorable to the court's rulings, disregarding contrary evidence and inferences, to determine if they are supported by substantial evidence. *Davis,* 980 S.W.2d at 94[3]. Upon appellate review, we may consider the record made at the pre-trial hearing and the record made at trial. *Woolfolk,* 3 S.W.3d at 828[2]. The trial court's rulings will be affirmed unless it is shown the court abused its discretion. *Id.* at 828[3].

■ The State's evidence concerning Defendant's condition at the hospital included the following. At the suppression hearing, Collard was asked: "[D]id you ask the defendant prior to withdrawing the blood from his arm whether you could do that[,]" to which he responded, "No, sir." When asked why not, Collard answered, "He was unconscious. He was unable to respond to any question." Collard also testified that Aden and other nurses at the hospital told him Defendant was unconscious. At trial, Collard testified that when he tried to talk to Defendant at the hospital Defendant was "very incoherent and/or unconscious. I couldn't tell either way. His eyes were closed, and I was

getting no reaction from him." Continuing, Collard testified, "I wasn't actually touching him, but I was down, you know, talking [in] a very loud manner to him, trying to see if I couldn't get a reaction, see if I could see an eyelid move...." During cross-examination, Collard was asked, "[D]o you know whether [Defendant] was unconscious at the time that you determined that his blood should be drawn[,]" to which he answered, "My observation is, yes, he was unconscious at that time."

Defendant's evidence about his state of consciousness came from Aden. In deposition testimony presented at the suppression hearing, Aden stated Defendant was conscious while in the emergency room. However, Aden conceded she "really" did not have an independent recollection of her contact with Defendant and that "[i]t is all very vague." She explained her belief Defendant was conscious while in the emergency room as follows: "[Defendant] would have had to been [conscious] for me to draw [blood] for the officer, because [patients] have to give a verbal consent[.]" In a similar vein, Aden claimed: "[Defendant] did not [lose consciousness] because I would have charted a loss of consciousness[.]" At trial, Aden's testimony varied from that found in her deposition in that she stated she did indeed remember the night in question and Defendant was never unconscious.

■ Faced with Aden's inconsistent accounts versus Collard's testimony, the trial court made a credibility determination. The trial court was free to believe or disbelieve the testimony of either witness, even when uncontradicted. *State v. Boyd,* 999 S.W.2d 276; *Kelley,* 953 S.W.2d at 93[52]. The trial court chose to believe Collard's testimony that Defendant was unconscious or otherwise in a condition rendering him incapable of refusing to sub-

mit to the blood test, which was its prerogative. As an appellate court, we will not invade the trial court's domain of credibility determination.

We find sufficient evidence to deny Defendant's motion to suppress and admit that evidence at trial based on § 577.033. The trial court did not err in overruling Defendant's pre-trial motions nor abuse its discretion in overruling Defendant's at-trial objection to the blood-alcohol evidence. Point denied.

Defendant's second point maintains the trial court erred in denying Defendant's motion to strike juror Hurd for cause because she indicated that she would have to hear from Defendant personally, i.e., hear him testify, before she could acquit him. He argues that juror Hurd's asserted inability to acquit Defendant if he did not testify disqualified her from jury service. Defendant insists that forcing him to trial with Hurd on the jury violated his constitutionally-guaranteed privilege against self-incrimination. The State answers this argument by saying that the trial court, through its independent and subsequent questioning of the jurors, rehabilitated juror Hurd and obtained from her an unequivocal assertion that she could follow the court's instruction to draw no inference from the fact that Defendant did not testify.

Defendant's claim of trial court error centers around the following voir dire questions and answers:

"Q. [by defense counsel] Is there anyone who feels that they would have to hear from [Defendant] himself before they could acquit him? Does anyone feel that way?

. . . .

"A. [Venireperson Hurd] Yes.

"Q. And do you feel that you would have to hear testimony from his own mouth before you could acquit him?

"A. [Venireperson Hurd] Yes, I would."

Ten other venirepersons answered similarly, i.e., that they would like to hear testimony from Defendant. After defense counsel finished questioning the panel, the trial judge questioned them as follows:

"THE COURT: ... A number of you responded when [defense counsel] asked you about the defendant testifying or not testifying. You need to understand that the defendant has a constitutional right not to testify. I don't know whether he will testify or not testify in this trial. If, however, he chose not to testify and the court would then instruct you that you could draw no inference from the fact that he did not testify, how many of you could not follow that instruction?"

The court reporter noted in the transcript that no hands were raised in response to this question. The trial judge continued:

"THE COURT: You are entitled to your opinions. I don't want to scare anybody off, okay? Your opinions aren't wrong. I just want to know how many of you could not follow that instruction?"

As before, the record reflects no jury panel member raised his or her hand in response to the court's question.

In reviewing Defendant's claim, we are mindful that a trial court has broad discretion in ruling on challenges for cause. *State v. Harris*, 870 S.W.2d 798, 805 (Mo.banc 1994). Appellate courts will not disturb a trial court's ruling on a challenge for cause unless it constitutes a clear abuse of discretion and results in a real probability of injury to the complaining party. *Id.* at 805–806[4]. The qualifications of a venireperson are not determined conclusively by a single response but are

made on the basis of the entire examination. *State v. Brown,* 902 S.W.2d 278, 285[3] (Mo.banc 1995).

To qualify to serve as a juror, a person must be able to answer the questions presented with an open mind free from bias and prejudice. *State v. Ervin,* 835 S.W.2d 905, 915[6] (Mo.banc 1992). A trial court commits reversible error if it denies a legitimate request by an accused to excuse for cause a partial or prejudiced venireperson and such unqualified juror actually serves on the final jury. *State v. Wise,* 879 S.W.2d 494, 512 n. 9 (Mo.banc 1994); *State v. McElroy,* 894 S.W.2d 180, 184[2] (Mo.App.1995). "The critical question in a bias challenge is whether the venireperson unequivocally indicated an ability to evaluate the evidence fairly and impartially." *State v. Storey,* 901 S.W.2d 886, 894[21] (Mo.banc 1995). A trial court has a duty to make an independent inquiry when a prospective juror equivocates about his or her ability to be fair and impartial. *State v. Walton,* 796 S.W.2d 374, 377[5] (Mo.banc 1990). Where a venireperson's answer suggests a possibility of bias, but upon further questioning that person gives unequivocal assurances of impartiality, the bare possibility of prejudice will not disqualify such rehabilitated juror nor deprive the trial court of discretion to seat such venireperson. *Id.* at 377[6].

Defendant argues the record fails to show juror Hurd was rehabilitated because she never unequivocally stated she would not draw an unfavorable inference of guilt from Defendant's failure to testify or that she could follow the law and instructions of the court, if given, as to such matters. As this court understands his argument, Defendant asserts that Hurd's response, i.e., silence, when asked if she could follow the court's instruction is insufficient to demonstrate unequivocal impartiality.

Defendant has cited no relevant case law for his argument. The only case which is cited for other than general principles of law is *State v. Bishop,* 942 S.W.2d 945 (Mo.App.1997). Defendant's reliance thereon is misplaced. In *Bishop,* a juror indicated she could not be impartial if Bishop did not testify. Thereafter, *no* questions were posed to the juror in an attempt to rehabilitate her. In reversing, this court stated, "had she thereafter been asked if she would follow the court's instructions despite her concerns about [Bishop] not testifying, we would have quite a different case." *Id.* at 949–50. Unlike in *Bishop,* juror Hurd was specifically asked (twice) if she could put her opinions aside regarding Defendant choosing not to testify and follow the court's instruction. Certainly, this is "quite a different case" than that of *Bishop.*

In *State v. Leisure,* 796 S.W.2d 875 (Mo.banc 1990), a venireperson "stated during voir dire that she would hold against defendant the fact that he would not testify in his own defense." *Id.* at 880. In finding no error in allowing the person to serve on the jury, the supreme court noted she was asked "point blank" if she could follow the court's instructions and the law and not hold the defendant's silence against him. *Id.* Her affirmative response was sufficient to rehabilitate her.

The only difference between the case at bar and *Leisure* is that here Hurd indicated her response to the court's "point blank" question by silence. Without citing any precedent, Defendant boldly claims that silence can never be an unequivocal demonstration that one can be impartial sufficient to constitute rehabilitation. This question is answered by *State v. Brown,* 669 S.W.2d 620 (Mo.App.1984). In *Brown,* seven venirepersons indicated a bias in favor of certain witnesses. *Id.* at 622. Two eventually served on the jury. Upon

hearing the equivocal answers, the trial court immediately inquired of the panel as follows: "Is there anybody here who couldn't take that evidence that's presented and give it—that testimony and give it the weight and value that you believe it's entitled to receive; if so raise your hand." *Id.* at 623. No potential jurors raised their hands. The *Brown* court found this response, i.e., silence, was sufficient to constitute rehabilitation. The court noted, "Contrary to counsel's suggestion, the court's method of inquiry was sufficient; it was not bound to inquire in any particular manner nor ask additional questions." *Id.* Based on *Leisure* and *Brown,* we find the court sufficiently rehabilitated juror Hurd to allow her to serve on the jury.

Juror Hurd unequivocally stated, albeit by her silence, she could follow the court's instructions and the law and not form an adverse inference from Defendant choosing not to testify. This was sufficient for rehabilitation of a potential juror. We find the trial court did not abuse its discretion in denying Defendant's challenge for cause to juror Hurd.[4] Point denied.

The judgment of the trial court is affirmed.

MONTGOMERY, J., and BARNEY, C.J., CONCUR.

---

4. We pause here briefly to note Defendant makes an additional argument under this point which is not supported by precedent. Defendant argues that the two *answers* are contradictory, thus making it impossible to find an unequivocal response indicating impartiality. If this were the standard, no potential juror could ever be *rehabilitated.* By the very essence of the concept of rehabilitation, there will always be two or more contradictory *answers.* The question is not whether a potential juror has some opinion regarding the case, but whether these opinions will yield and the juror will determine the issues under the law. *State v. Feltrop,* 803 S.W.2d 1, 8[7] (Mo.banc 1991).